**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **ADRIANA MORET (n'ee VALBUENA),** | ⋮ | |
| **Plaintiff,** | ⋮ | |
| **v.** | ⋮ | **Civil Action No.  AW-04-3043** |
| **PETE GEREN, Secretary of the Army,** | ⋮ | |
| **Defendant.** | ⋮ | |

---

## MEMORANDUM OPINION

Plaintiff Adriana Moret, n'ee Valbuena, ("Plaintiff" or "Moret") brings this employment discrimination action against her employer alleging discrimination on the basis of sex and retaliation for having engaged in a protected activity, in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII").  Currently before the Court are Defendant's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [66] and Defendant's Motion to Strike Declaration of Adriana Moret [80].  Plaintiff contests both motions.  The Court has reviewed the entire record, as well as the pleadings and applicable law with respect to the instant motions.  On June 13, 2007, the Court held a hearing concerning the motion and heard from all the parties. Having considered the arguments of Plaintiff and Defendant, and for the reasons set forth more fully below, the Court will GRANT Defendant's motion for summary judgment and DENY Defendant's motion to strike.

## FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to the nonmovant.  In September

1999, Moret interviewed with Lieutenant Colonel Olin Ohrt ("Ohrt").  Because Ohrt was unable to offer Moret a paid position, she offered to volunteer her services without remuneration until a paid position became available.  Upon receiving Moret's offer of services, Ohrt sent Moret to Dr. Ho Chung ("Dr. Chung"), Chief of the Department of Pharmacology at the Walter Reed Army Institute of Research ("WRAIR"), to discuss volunteer positions.  Instead of accepting her offer of voluntary service without remuneration, Dr. Chung hired Moret for a paid Research Assistant position and offered to pay her out of his own contract money.

From September 1999 until May 2000, Moret performed her job functions without incident. On May 12, 2000, Moret went to Dr. Chung's office to discuss her pay and benefits.  Dr. Chung was alone in his office and he shut the door behind Moret.  Dr. Chung sat down at his desk and asked Moret how much money she would like to make.  Moret asked what was customary for a person with her experience.  Dr. Chung explained that what others made was irrelevant because he had the power to pay her whatever she wanted.  Dr. Chung further explained that he had a lot of connections within the Walter Reed supervisory command chain and would be able to give Moret full benefits. During the same meeting, Dr. Chung asked Moret if she had ever seen a picture of his children, whereupon he produced a photograph of his wife and two adult children.  Dr. Chung then explained that he could envision Moret dating his oldest son.  Dr. Chung then picked up the phone and called his son, and forced Moret to talk to his son on the telephone.  While she was still on the telephone, Dr. Chung whispered to Moret not to tell anyone he had done this.

Also, during the May 12, 2000, meeting Dr. Chung asked Moret if she had "strong fingers." Dr. Chung explained to her that he needed to relieve some back pain and that he wanted to teach Moret acupressure techniques.  Dr. Chung told her that he would bring in a book so she could look

at it and learn about acupressure and massage.  Dr. Chung then asked Moret if she would come over to his house and massage him.  Dr. Chung told Moret not to say anything to anyone, especially anyone "American" because they would think of it as sexual harassment.  Dr. Chung said that since Moret is not American that she would be "OK" doing what he asked.  As he suggestively pointed to his buttocks, Dr. Chung told Moret that he especially needed a massage there.  Dr. Chung alternated discussing Moret's salary and benefits with asking Moret if she had "strong fingers," and Dr. Chung emphasized to Moret that he could "make things happen for her."  Moret walked out of Dr. Chung's office without saying a word.

In August 2000, coincident with the finalization of Moret's second year contract, Dr. Chung offered Moret less than he had originally offered.  In fact, his offer was even less salary than  she was making at the time.  Dr. Chung also informed Moret that he would not provide her with benefits.

On October 17, 2000, Dr. Chung came into Moret's office and started talking to her about his personal domestic issues.  Dr. Chung asked Moret again if she had "strong fingers."  This time Moret told him "no."  Moret offered to get Dr. Chung a number from a friend who goes to a professional for acupressure.  Dr. Chung responded that he did not want to pay for professional services, but instead wanted Moret to perform the massage and acupressure services.  In the same conversation, Dr. Chung told Moret that he would deliver his acupressure book to her so that she could provide his nude massage.  Dr. Chung told Moret that he had the power to appoint her to a civil service position and give her full health benefits.  Dr. Chung implied that he would only appoint her to such a civil service position if she complied with his requests.  Moret responded to Dr. Chung's entreaty by telling him that he might consider asking his wife for massage therapy.

After these interactions, Moret was forced to work with Dr. Chung on a daily basis.  Dr.

Chung continuously gawked at Moret, making her feel very uncomfortable and nervous. Specifically, Moret gained weight, was frightened for her safety, vomited on a weekly basis thinking of Dr. Chung, developed cystic acne, and had a strained relationship with her fiancé.

After several months of enduring Dr. Chung's continuous and unseemly conduct, on January 9, 2001, Moret reported Dr. Chung to Colonel Wilbur Milhous ("Milhous"), the Director of the Division of Experimental Therapeutics at WRAIR.  Upon learning of Moret's allegations, Milhous blamed Moret for Dr. Chung's conduct, and stated that if one of his daughters had been subject to Dr. Chung's advances, they would have handled Dr. Chung's entreaties more deftly.  Milhous went on to "test" Moret on whether she knew the difference between sexual harassment and playful banter by telling Moret a fable about the interactions of monkeys.

Moret complained about Milhous to Col. John Brown ("Brown"), Executive Officer at WRAIR, who assured her that he would take affirmative steps to resolve the situation.  Thereafter, Brown told Moret that on January 26, 2001, he had ordered Milhous to remove Dr. Chung from Moret's worksite.  Brown explained that transferring Dr. Chung would allow Moret to move freely in and out of the General Pharmacology Department without being harassed.  However, between January 30, 2001 and February 9, 2001, Moret discovered that Dr. Chung still worked in her building.  On February 9, 2001, Moret filed an informal complaint with the EEO office at the WRAIR.

On February 20, 2001, Moret realized that Dr. Chung was never removed from his office. Brown called the Division of Experimental Therapeutics and talked to Ohrt, who informed him that Dr. Chung was not moved to another office as directed.  After speaking with Ohrt, Brown called Milhous at home and asked him who modified the directive to move Dr. Chung to another office.

Milhous stated that he modified the directive.

On February 21, 2001, Milhous stopped Moret while she was on her way into work and asked to "have a word with her."  Milhous informed Moret, in the middle of public hallway, that he was placing Dr. Chung on "office arrest," meaning Dr. Chung could not leave his office during business hours.  He acknowledged that he took this course despite Brown's directive to move Dr. Chung to another building.  Milhous also announced that he was moving Moret's inbox to a different part of the office, and Moret was to process vouchers and place orders with a different person.

WRAIR initiated a three part "military investigation" on February 21, 2001.  The purpose of this investigation was to determine:  (1) whether Dr. Chung, in his capacity as Chief of the Department of Pharmacology, sexually harassed two female contract employees by either creating a hostile work environment, or engaging in *quid pro quo* sexual harassment; (2) whether WRAIR management properly addressed the sexual harassment allegations when the female contract employees documented the allegations; and (3) whether there existed a need for additional training for managers, federal government employees, and contract employees regarding how to report and respond to sexual harassment allegations.  On March 21, 2001, the first part of the investigation was concluded and the investigator found that the preponderance of evidence indicated that Dr. Chung sexually harassed Moret.  The investigator also declared that Moret was a credible witness who described the incidents in detail.

On April 17, 2001, WRAIR initiated the second part of this military investigation to determine whether Milhous properly handled Moret's complaint and instituted proper prophylactic measures.  The next day, Moret met with EEO officer Mark Loberg ("Loberg") to discuss the findings of the first investigation phase.  At this meeting, Loberg presented Moret with a "Notice

of Right to File a Formal Complaint" for her to sign.  Even though Moret had received this notice, outlining her right to file a formal complaint, she still failed to file a formal EEO complaint by the regulatory deadline of May 2, 2001.

On January 15, 2002, Thomas F. Dickerson ("Dickerson") of the EEO office informed Moret that WRAIR had completed its "military" investigation on May 15, 2001.  When Moret asked about her rights to further investigation, Dickerson replied that she no longer had the right to file a formal complaint because she had not filed the complaint within fifteen days of having received the "Notice to File a Formal Complaint" on April 18, 2001.

Moret nevertheless attempted to file a formal complaint via letter to Loberg on March 22, 2002, citing her reasons for delay.  In the letter, Moret reminded Loberg that he assured her that she had done everything necessary to bring her complaint.  Moret also told Loberg that he never advised her that she needed to do anything further until after the "military" investigation was finished.  After receiving the results of the investigation, Moret sent a letter to Karen Ruby at the Walter Reed EEO office requesting that she either process Moret's formal complaint or issue a notice that the EEO office will not process the complaint.  On September 10, 2002, Moret received a letter from Dickerson restating WRAIR's position that it would not process her complaint because her formal complaint was untimely.

Moret then appealed to the EEOC, requesting that her March 22, 2002 formal complaint letter be considered timely in light of the fact that she was given false, misleading advice from Loberg.  On April 10, 2003, the EEOC dismissed Moret's appeal finding that Moret failed to timely file her administrative complaint.

Moret subsequently filed a complaint in federal court.  Moret filed an Amended Complaint,

6

and a Second Amended Complaint, alleging discrimination based on sex in violation of Title VII

(Count I) and retaliation for having engaged in a protected activity in violation of Title VII (Count

II).  On December 1, 2004, Defendant filed a Motion to Dismiss or, in the alternative, for Summary

Judgment.   On August 2, 2005, the Court issued a Memorandum Opinion and Order treating

Defendant's Motion to Dismiss or, in the alternative, for Summary Judgment as a Motion to Dismiss

for Failure to State a Claim under Rule 12(b)(6).  Furthermore, the Court granted-in-part and denied-

in-part Defendant's Rule 12(b)(6) motion and denied-as-moot Defendant's motion for summary

judgment.    Moreover, the Court dismissed Moret's May 12, 2000 discrimination claim, leaving

Moret's remaining claims of discrimination pending.  Currently pending are Defendant's Motion

for Judgment on the Pleadings or, in the Alternative, for Summary Judgment [66] and Defendant's

Motion to Strike Declaration of Adriana Moret [80].  Plaintiff opposes both motions.  Discovery has

been completed.  The motions are ripe and the Court now issues this Opinion.

## STANDARD OF REVIEW

At the motions hearing, Defendant indicated that its motion for judgment on the pleadings

or, in the alternative, for summary judgment is actually a motion for summary judgment and should

be construed as such.  Therefore, the Court will convert Defendant's motion for judgment on the

pleadings or, in the alternative, for summary judgment into Defendant's motion for summary

judgment.

Under the Federal Rules of Civil Procedure, a party is entitled to summary judgment if it

demonstrates that there are no genuine issues of material fact and that the moving party is entitled

to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317,

323-25 (1986).  In a motion for summary judgment, the moving party discharges its burden by

showing an absence of evidence to support the non-moving party's case.  Celotex, 477 U.S. at 325.

When faced with a motion for summary judgment, Rule 56(e) requires the non-moving party "to go

beyond the pleadings" and show the existence of a genuine issue for trial, by way of affidavits,

deposition testimony, or answers to interrogatories.  Id. at 324; see also Matsushita Elec. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587 (1986).  While the evidence of the non-movant is to be

believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine

dispute of material fact through mere speculation or compilation of inferences.  See Deans v. CSX

Transp., Inc., 152 F.3d 326, 330-31 (4th Cir. 1998); Beale v. Hardy, 769 F.2d 213, 214 (4th Cir.

1985).

## DISCUSSION

### I.  Defendant's Motion to Strike Plaintiff's Declaration

Motions to strike pleadings or a portion thereof are governed by Fed. R. Civ. P. 12(f).[1]  The

Fourth Circuit has noted that motions brought under this Rule are typically disfavored "because

striking a portion of a pleading is a drastic remedy and because it is often sought by the movant

simply as a dilatory tactic." 5A A. Charles Alan Wright, et al., Federal Practice & Procedure §

1380, 647 (2d ed. 1990).  Waste Mgmt. Holdings v. Gilmore, 252 F.3d 316, 347 (4th Cir.2001); see

also Talbot v. Robert Matthews Distrib. Co., 961 F.2d 654, 664-65 (7th Cir. 1992) (noting that

allegations may be stricken under Rule 12(f) if the matter bears no possible relation to the

---

[1]Rule 12(f) of the Federal Rules of Civil Procedure states: "Motion to Strike. Upon motion made by either party before responding to a pleading, or if no responsive pleading is permitted by these rules, upon motion made by either party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." FED. R. CIV. P. 12(f).

controversy or may cause the objecting party prejudice).

Federal Rule of Civil Procedure 12(f) relates to matters to be stricken from pleadings. Although affidavits technically do not constitute pleadings, courts have permitted affidavits to be challenged by motions to strike because the Federal Rules provide no other means to contest their sufficiency. McLaughlin v. Copeland, 435 F. Supp. 513, 519 (D. Md. 1977). If portions of an affidavit are inadmissible, the whole affidavit need not be stricken but only those portions which are deficient. Id.

Generally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court. Federal Rule of Civil Procedure 56(e) specifically requires that affidavits submitted on summary judgment contain admissible evidence and be based on personal knowledge. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (evidence submitted in opposition to summary judgment must be admissible and based on personal knowledge). Thus, summary judgment affidavits cannot be conclusory, Rohrbough v. Wyeth Lab., Inc., 916 F.2d 970, 975 (4th Cir. 1990) or based on hearsay, Maryland Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251-52 (4th Cir), cert denied, 502 U.S. 939 (1991).

The parties concede that a party who has been questioned at length during a deposition cannot submit an affidavit that contradicts the deposition testimony to create a genuine issue of material fact. See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (citations omitted). "A genuine issue of material fact is not created where the only issues of fact is to determine which of the two conflicting versions of the plaintiff's testimony are correct." Id.

Defendant claims that the Court should strike the declaration of Adrianna Moret because her

deposition testimony [2] is inconsistent and contradictory with her declaration.[3]  Plaintiff, on the other

hand, alleges that her declaration merely clarifies and summarizes her deposition testimony.

Here, there is no question that Plaintiff's declaration was not a verbatim repetition of her

deposition testimony.  However, the Court does not believe that Plaintiff coincidently filed a post-

discovery declaration which disputes an alleged material fact that is currently under review at this

stage of the litigation.  The Court is skeptical of Plaintiff's effort to dispute facts that had been

articulated before she retained counsel.  However, the Court, exercising great caution, will DENY

Defendant's motion to strike Plaintiff's declaration.

---

[2]

| [Def.'s Att'y]: | ... [W]hat do you recall Mr. Loberg telling you about your right to file a formal complaint of discrimination? |

| [Plaintiff]: | What I recall from the meeting is that he explained to me that there is the informal and then the formal investigation.  He said that he had conducted the informal and that the formal - that he had discovered that the formal was already in progress.  And so, therefore, the - we would have to wait until the formal was over and then we would come back and meet again.  And he presented me with this paper and said, just sign here saying that you understand what I told you. |

(Moret Dep. 150-51).

[3]

Mr. Loberg explicitly represented to me that I was not permitted to
file a formal complaint of harassment until the Army had concluded
its military investigation.  (Moret Aff. ¶13)

10

**II.     Defendant's Motion For Summary Judgment**

*A.  Exhaustion of Administrative Remedies*

Prior to bringing a civil complaint, federal employees must first exhaust their administrative remedies.  See Khoury v. Meserve, 268 F. Supp. 2d 600, 607 (D. Md. 2003) ("Before a plaintiff has standing to file suit under Title VII, [s]he must exhaust [her] administrative remedies ...").  Moret alleges that on October 17, 2000, Dr. Chung sexually harassed her.  As a federal employee, Moret was required to seek EEO counseling regarding the alleged discriminatory acts by the agency within 45 days of the date the events occurred.  See 29 C.F.R. § 1614.105(a)(1).  If the counseling session is unsuccessful, an employee is required to file a formal complaint with the agency within 15 days of receiving notice to do so.  See 29 C.F.R. § 1614.106(b).  Although Defendant does not allege that Moret untimely sought out an EEO counselor, the Court notes that Moret did not seek EEO counseling in regard to her alleged discriminatory event until February 9, 2001, 115 days after the alleged instance of discrimination took place.  Additionally, it is undisputed that Moret failed to file a formal complaint, much less file within the fifteen 15 day requirement.  As such, Moret's failure to timely initiate EEO counselor contact and to file a formal complaint are grounds for dismissal for failure to exhaust administrative remedies.  See Zografov v. V.A. Med. Cntr., 779 F.2d 967, 970 (4th Cir. 1985).  The Fourth Circuit has ruled that these deadlines act as a statute of limitations which are subject to equitable tolling.  Id.  Therefore, unless Moret's claims fall within an exception, her claims must be dismissed for failure to exhaust administrative remedies.

The Court applies equitable exceptions sparingly because the certainty and repose the provisions confer will be lost if their application is up for grabs in every case.  Olson v. Mobile Oil Corp., 904 F.2d 198, 200 (4th Cir. 1990).  "The doctrines of equitable tolling and equitable estoppel

have a common origin; they are based primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing her claim on time." English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987).  Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action.  See Lawson v. Burlington Indus., 683 F.2d 862, 864 (4th Cir. 1982); Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir. 1985); Meyer v. Riegel Prod. Corp., 720 F.2d 303, 307-08 (3d Cir. 1983).  To invoke equitable tolling, the plaintiff must therefore show that the defendant attempted to mislead her as to whether there was a factual basis for filing a claim and that the plaintiff reasonably relied on this misrepresentation in neglecting to file a timely charge.  Lawson, 683 F.2d at 864; Coke v. Gen. Adj. Bureau, Inc., 640 F.2d 584, 595 (5th Cir. 1981); see also Weick v. O'Keefe, 26 F.3d 467 (4th Cir. 1994) (granting equitable tolling).

Equitable estoppel applies where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline.  Felty v. Graves-Humphreys, 818 F.2d 1126 (4th Cir. 1987); Price v. Litton Bus. Sys., Inc., 694 F.2d 963, 965 (4th Cir. 1982).  See also Cerbone, 768 F.2d at 49-50; Dillman v. Combustion Engineering, 784 F.2d 57, 60-61 (2d Cir. 1986).  "The statute of limitations will not be tolled on the basis of equitable estoppel unless the employee's failure to file in a timely fashion is the consequence of either a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." Price, 694 F.2d at 965.

Plaintiff asserts that she is entitled to equitable relief.  An employer may not claim the statute of limitations as a defense where it has acted to "conceal the existence of a cause of action." English, 828 F.2d at 1049.  Here, Moret alleges that Loberg "explicitly represented to [her] that [she]

12

was not permitted to file a formal complaint of harassment until the Army had concluded its military investigation." (Moret Aff. ¶ 13, Jan. 25, 2007). However, besides Moret's self-serving post-discovery affidavit, the summary judgment record is barren as to any evidence of either a deliberate design or actions, which Loberg should have unmistakably understood would cause Moret to delay filing her formal charge. In fact, the record is replete with evidence to the contrary. (Moret Dep. 153, Aug. 24, 2006) (when asked if she believed that Loberg intentionally or purposefully misled her into not filing, Moret responded, "I don't know."); (Loberg Dep. 182-83, Aug. 10, 2006) (where Loberg explicitly denies that he misled Moret about the filing requirements for her formal complaint); (Loberg Dep. 84-85) (claiming that he had fully explained her rights and responsibilities, including her right to file a formal complaint of discrimination, and that Moret even signed the notice of the right to file a formal complaint of discrimination); and (Def.'s Ex. 18, *Aggrieved Person's Rights and Responsibilities Notice (Form B)*) (a form that outlines specifically Moret's rights and responsibilities, which Moret signed on February 9, 2001 indicating that she "certif[ies] that [she has] been advised of [her] rights and responsibilities as stated on [the] memorandum which the EEO Counselor has presented to [her]"). Thus, equitable tolling does not apply because Loberg did not conceal facts Moret could have used as a basis to file a complaint. Accordingly, the Court will now turn to its analysis of whether equitable estoppel is applicable here.

Despite Moret's allegations that she was not permitted to file a formal complaint of harassment until the Army had concluded its military investigation (Moret Aff. ¶ 13), the record reflects that she knew or should have known that she was required to file a formal complaint within 15 days of her April 18, 2001 meeting with Loberg. (Def.'s Ex. 21, *Notice of Right to File a Formal Complaint of Discrimination-After Informal Counseling (Form M)*) (a form that Moret signed on

April 18, 2001, explicitly outlining that "If [she] believe[s] that [she has] been discriminated against on the basis of race, color, religion, sex, national origin, age, mental/physical handicap, and/or reprisal for participation in protected EEO activity or opposition to prohibited discrimination, [she has] the right to file a complaint of discrimination within 15 calendar days of the receipt of this notice")[4]; (Lee Dep. 107-08, Sept. 14, 2006) (when asked what Loberg had told her and Moret regarding the EEO process, Lee asserted that "[Loberg] said [they] had a certain amount of time ... before it was not possible to file a formal complaint ... 15 days."); and (Lee Dep. 110) (when asked whether Loberg ever intentionally or purposely misled her in not filing her formal complaint of discrimination, Lee merely stated that Loberg said that Dr. Chung is a nice guy, and that he could not believe Dr. Chung would actually do what Lee and Moret accused him of doing).

Here, Plaintiff has failed to demonstrate instances where Defendant, through a deliberate design, wrongfully deceived or misled Moret from timely filing her formal charge. Nevertheless, an employer's misbehavior does not excuse employees from their obligation to reasonably pursue their rights. See Chao v. Va. DOT, 291 F.3d 276, 283 (4th Cir. 2002) ("Equitable tolling is not appropriate ... 'where the claimant failed to exercise due diligence in preserving his legal rights.'") (quoting in part Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990); Kokotis v. U.S. Postal Service, 223 F.3d 275, 280 (4th Cir. 2000).

In the instant case, Plaintiff failed to seek out an EEO counselor in a timely manner. The

---

[4] On April 18, 2001, Moret, for the second time, signed a form acknowledging that she understood her rights to file a formal complaint with the EEOC. The first time she signed off on a form indicating that she understood her rights was on February 9, 2001, discussed *supra*, when Moret signed the *Aggrieved Person's Rights and Responsibilities Notice (Form B)*, certifying that she was advised of her rights and responsibilities by the EEO Counselor. (Def.'s Ex. 18, *Aggrieved Person's Rights and Responsibilities Notice (Form B)*).

Court believes that even if Moret mistakenly believed that the military investigation was the formal EEO investigation,[5] Moret's argument misapprehends the nature of equitable tolling.  See English, 828 F.2d at 1049 (citing McClinton v. Alabama By-Products Corp., 743 F.2d 1483, 1486 (11th Cir. 1984)) ("If notice is properly posted and the employee does not see it or sees it but is still not aware of his rights, there will normally be no tolling of the filing period.").  Likewise, here, Loberg not only provided Moret with the information outlining her rights and responsibilities, but Moret affirmatively signed the document certifying that Loberg presented her with the relevant information.  Therefore, the Court believes that the charging period should not be tolled based on the employee's mistaken reliance or belief where there is insufficient evidence to suggest wrongdoing by Defendant.

Furthermore, even if the Court granted an equitable remedy, her claim must be dismissed because she failed to file a formal claim fifteen days from the day she became aware of her rights and again when she retained counsel.  English, 828 F.2d at 1049 (finding that even "[i]f an employer violates the posting requirement, the charging period is tolled until the plaintiff acquires actual knowledge of his rights or retains an attorney.") (citation omitted).    To date, Plaintiff has failed to file a formal complaint with the EEOC.  Therefore, the Court finds that Plaintiff has failed to exhaust her administrative remedies, where, in this instance, the doctrines of equitable tolling and equitable estoppel are not applicable.  Accordingly, the Court GRANTS Defendant's motion for summary judgment.

B.  *Substantive Claims*

---

[5]  At the motions hearing, Plaintiff suggested that the Army misled her into believing that the military investigation was actually the formal EEO investigation.  The record is bereft of any such evidence.  The Court, for the first time, heard Plaintiff's new theory at the motions hearing.

Although the Court grants Defendant's motion for summary judgment as to Plaintiff's failure to exhaust administrative remedies discussed *supra*, solely for the purposes of resolving Moret's Title VII claims, the Court will continue to analyze Plaintiff's claims as if she had successfully exhausted her administrative remedies.

1.  Sexual Harassment

Liability for sexual harassment can be premised on either of two theories: *quid pro quo* or hostile work environment. Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 854 (1st Cir. 1998). The Supreme Court in Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57 (1986), recognized that a claim of hostile work environment sexual harassment is a form of sex discrimination that is actionable under Title VII, independent of *quid pro quo* sexual harassment. Id. at 67. Accordingly, the Court will analyze each claim separately and address them in turn.

a.  *Quid Pro Quo*

The Fourth Circuit has determined that *quid pro quo* sexual harassment can be established by a five-element *prima facie* case: (1) the employee belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the employee's reaction to the harassment affected tangible aspects of her compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known about the harassment and took no effective remedial action. Spencer v. Gen. Elec. Co., 894 F.2d 651, 658 (4th Cir. 1990).

Assuming *arguendo*, that Plaintiff satisfies elements one, two, three, and five of the *quid pro quo* analysis, the Court believes that Moret fails to establish the fourth element. Here, the mere fact that Plaintiff's contract was not renewed does not, in itself, demonstrate a tangible *quid pro quo*

action.  See Wang v. Metro. Life Ins. Co., 334 F. Supp. 2d 853 (D. Md. 2004) (finding that plaintiff's termination, standing alone, was not enough to establish a *quid pro quo* action).  The facts of this case are similar to the facts of the Wang case.  In Wang, the Court found that because the termination occurred nine months after Plaintiff's last encounter with her supervisor and because she offered no evidence to suggest that the termination related in any way to the alleged sexual harassment by her supervisor, she failed to establish a *prima facie* case of *quid pro quo* sexual harassment.  Id.  Here, similarly, Moret's contract expired, and was not renewed, on September 30, 2001, over eight months after she reported complaints against Dr. Chung.  Furthermore, as Moret was not entitled to a renewal of her contract, Plaintiff additionally fails to present evidence where any tangible aspects of her compensation were affected.[6]  Instead, Plaintiff alleges that she was promised a civil service position by Dr. Chung and because she did not receive one, she claims that there was a tangible aspect of her compensation that was affected.[7]  However, this argument is flawed.  Regardless of whether Plaintiff felt entitled to such a position, the Defendant notes, and the Court agrees that Plaintiff's entitlement to such a position is illogical as these positions must first be vacant and then be competitively filled.[8]  Moreover, Plaintiff fails to provide evidence that her termination was related in any way to the alleged sexual harassment by Dr. Chung.  As a result,

---

[6]  Plaintiff continued to receive all payments associated with her 2000-01 contract ($32,508.00) even after the alleged sexual harassment by Dr. Chung.  Furthermore, she was even offered an extra $2000 to purchase benefits.  (Moret Dep. 72-77).

[7]  "Plaintiff was unsure at the time, and remains so today, whether Dr. Chung's offer of a permanent position with benefits meant that he was offering her a civil service ("GS") position or a contract position with enhanced stability."  (Pl.'s Opp. Br. 29).

[8]  Dr. Chung never had the authority to offer or give Moret a full-time permanent civil service position because, like any federal agency, to obtain a civil service position there must be a vacant position that is advertised and competitively filled.  (Bossone Dep. 182-84); (Wilbur Dep. 330-34); (Ohrt Dep. 54-58); and (Thompkins Dep. 65-71).

Plaintiff has failed to establish the fourth element to a *prima facie* case of *quid pro quo* sexual harassment.  The Court finds that there is no genuine issue of material fact with respect to whether Moret's reaction to the harassment affected tangible aspects of her compensation.

*b.  Hostile Work Environment*

To establish a prima facie case of hostile work environment, the plaintiff must prove: (1) that she was harassed because of her sex; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) that some basis exists for imputing liability to the employer.  Smith v. First Union Nat'l Bank, 202 F.3d 234, 241 (4th Cir. 2000); See also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003).  To prevail on a hostile work environment claim, "a plaintiff must demonstrate not only that [s]he subjectively perceived h[er] workplace as hostile, but also that a reasonable person would perceive it, i.e., that it was objectively hostile."  Fox v. GMC., 247 F.3d 169, 178 (4th Cir. 2001) (citing Silk v. City of Chicago, 194 F.3d 788, 804 (7th Cir. 1999)).

In this jurisdiction there is a high burden of proof required to make out a sufficient hostile work environment claim.  Jeffers v. Thompson, 264 F. Supp. 2d 314, 331 (D. Md. 2003) (citing Porter v. Nat'l Con-Serv, Inc., 51 F. Supp. 2d 656, 659 (D. Md. 1998) aff'd 173 F.3d 425 (4th Cir. 1999)).  Defendant concedes that the alleged harassment by Dr. Chung was because of Moret's sex; therefore, the first element is satisfied.  However, assuming *arguendo* that Moret could fulfill the other elements of the hostile work environment test, the Court finds that she cannot meet the high burden of proof required to establish that Dr. Chung's actions were severe or pervasive.

The Supreme Court has stated that "in order to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable

18

person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher
v. City of Boca Raton, 524 U.S. 775, 787 (U.S. 1998).  In determining what the objective standard
for a hostile work environment is, the Supreme Court has said that the determination can be made
by looking at the circumstances of the employee's workplace experience.  Harris v. Forklift Sys.,
510 U.S. 17, 23 (1993).  The relevant factors in making the determination include (1) the frequency
of the discriminatory conduct; (2) the severity of the conduct; (3) whether the alleged conduct is
physically threatening or humiliating (as compared to mere offensive utterances); (4) whether the
conduct unreasonably interferes with an employee's work performance; and, (5) the effect on the
employee's psychological well-being.  Id.; see also Conner v. Schrader-Bridgeport Int'l, Inc., 227
F.3d 179 (4th Cir. 2000).  The Court implied that this list of factors does not exhaust what a fact
finder may consider in making the "hostile" or "abusive" determination, and stated that the presence
or absence of any of these factors is not dispositive.  Id.  Further, "'simple teasing,' offhand
comments, and isolated incidents (unless extremely serious) will not amount to discriminatory
changes in the 'terms and conditions of employment.'" Faragher, 524 U.S. at 788 (citing Oncale v.
Sundowner Offshore Servs., 523 U.S. 75, 81 (1998)).  Finally, mere unpleasantness is not sufficient
to qualify harassment as severe and pervasive.  Hartsell v. Duplex Prods., 123 F.3d 766, 773 (4th
Cir. 1997).

Moret contends that Dr. Chung:  sexually propositioned her while discussing her salary and
benefits (Moret Dep. 109); requested that she massage his nude buttocks (Moret Dep. 103); asked
if she had strong fingers (Moret Dep. 110); forced her to speak on the phone with his son (Moret
Dep. 101-02); suggested that she date his son (Moret Dep. 100); and, routinely leered at her, made
comments about her appearance, and made comments about her make-up (Moret Dep. 128).

Further, Moret alleges that Milhous insulted her by comparing her experience with Dr. Chung to a story about monkeys, said his own daughters would have handled Dr. Chung's harassment with more aplomb than Moret, and conducted meetings about sexual harassment in public areas where Moret feared Dr. Chung would overhear (Pl.'s Ex. 2 at 4, Colonel Edwin Armitage's Findings in the First Army Regulation 15-6 Investigation).  Taking the facts in the light most favorable to the Plaintiff, and accepting them as true, all of these combined activities are still insufficient to support a finding of the severe and pervasive requirement.[9]

Although the Court does not condone Defendant's behavior and believes that these experiences may have been unpleasant for Moret, the Court finds that these instances fall far short of the objective standard required to satisfy the third element of the hostile work environment test. There is an overwhelming amount of case law from this Circuit and District, some of which was cited in Defendant's brief, where Courts have found instances that were far more egregious than the facts alleged here, yet still found those situations insufficient to satisfy the severe and pervasive element.  See (Def.'s Mot. to Dismiss Br. at 30-34); see, e.g., Boarman v. Sullivan, 769 F. Supp. 904 (D. Md. 1991) (determining that a supervisor's conduct did not create an abusive work environment when he asked a female employee to shut his office door and remove all of her clothing); Dwyer v. Smith, 867 F.2d 184 (4th Cir. 1989) (affirming the District Court's directed verdict in favor of defendant where plaintiff's supervisor was alleged to be the "ring leader" who encouraged

---

[9] On August 2, 2005, the Court in Moret v. Harvey, 381 F. Supp. 2d 458 (D. Md. 2005) dismissed Moret's alleged accounts of Chung's May 12, 2000 harassment, leaving only the October 17, 2000 events as an independent cause of action.  Here, however, for the purposes of resolving this motion, and reviewing the facts in the light most favorable to Moret, the Court will consider all of Plaintiff's alleged accounts of sexual harassment in its analysis of whether these activities are severe and pervasive.

comments and attitudes toward plaintiff, placed pornographic material in her station mailbox, accused her of having sexual relations with other officers, engaged in gratuitously graphic conversations about victims of sex crimes, drove by her home to see if she had any male visitors, and generally referred to women in degrading terms;   "plaintiff was [merely] subject[ed] to inappropriate language and inappropriate references made to sex, but not harassment."); Naylor v. City of Bowie, 78 F. Supp. 2d 469 (D. Md. 1999) (finding a male supervisor's conduct of offhanded comments suggesting that he "wouldn't mind getting into [a female employee's] pants" and leaving a condom underneath a box of candies which he gave her as isolated offensive occurrences that did not rise to a level of severity and pervasiveness to create an objectively hostile or abusive work environment); Singleton v. Dep't of Corr. Educ., 115 Fed. Appx. 119 (4th Cir. 2004) (finding that "allegations that [Defendant] made offensive comments, showed [Plaintiff] unwanted attention that made her uncomfortable, and continuously expressed a sexual interest in her do not meet the high standard [for establishing severe and pervasive sexual harassment]").   Accordingly, the Court finds that Dr. Chung's conduct was neither severe nor pervasive as the encounters of harassment alleged by Moret are not as severe as the instances that the Fourth Circuit, as well as this District, has found neither severe or pervasive.   Plaintiff has failed to produce sufficient evidence to support a legal claim of severe and pervasive conduct establishing an abusive work environment.   Therefore, the Court will GRANT Defendant's motion for summary judgment as to Plaintiff's sexual harassment hostile work environment claim.

## 2.  Retaliation

Title VII also prohibits an employer from retaliating against employees who exercise their Title VII rights.   In particular, it is unlawful "for an employer to discriminate against any of his

employees ... because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" related to Title VII.  42 U.S.C § 2000e-3(a). An employee need not have instituted formal proceedings under Title VII to invoke protection of its retaliation provision; informal complaints to the employer suffice.  Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981).  Nor does the employee's underlying discrimination claim have to be meritorious to prevail on a claim of retaliation for opposition to perceived discrimination. Ross v. Comm. Satellite Corp., 759 F.2d 355, 357 n.1 (4th Cir. 1985).

To establish a prima facie case of retaliation, the employee must show (1) that she engaged in a protected activity; (2) that her employer took an employment action against her that a reasonable employee would have found materially adverse; and (3) that there was a causal connection between the protected activity and the adverse employment action.  Hill v. Lockhead Martin Logistics Mgmt., 354 F.3d 277, 298 (4th Cir. 2004); Burlington North. & Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006).  Defendant does not dispute that Moret engaged in a protected activity when, in January 2001, she reported her claims of alleged harassment by Dr. Chung.

However, to meet the second requirement, Moret must show that Defendant took a cognizable adverse employment action against her.  An adverse employment action is one which adversely affects the terms, conditions, or benefits of the plaintiff's employment.  See Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997), cert. denied, 522 U.S. 1116 (1998). Here, Plaintiff purports three instances that her employer took after she reported her claims of alleged harassment by Dr. Chung which she claims that a reasonable employee would have found materially adverse:  (1) that Col. Bossone treated Moret rudely and was "difficult" (Moret Dep. 157-58); (2) that she was denied a new computer by Col. Bossone (Moret Dep. 3, 81-83, 158-89); and

(3) that her contract was not renewed in the Fall of 2001 (Moret Dep. 85-86).

Under Title VII's retaliation provisions, the standard for demonstrating a materially adverse employment action is less stringent than the primary substantive provisions. See Burlington North., 126 S.Ct. 2405, 2414. Nevertheless, a plaintiff is still required to demonstrate actual harm or injury caused by the retaliatory conduct. Id. Unlike Title VII's substantive provisions, the anti-retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." Id. at 2412-13. Rather, Moret need only show that a reasonable employee would have found the action "materially adverse," meaning it "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 2415. This standard is an objective one. Id.

Here, the Court believes that neither Col. Bossone's refusal to give Plaintiff a new computer nor her alleged rude and difficult treatment of Moret amount to a materially adverse employment action capable of dissuading a reasonable worker from making or supporting a charge of discrimination. Furthermore, Courts have generally held that a non-renewal of a contract does not amount to a materially adverse action. Even assuming Defendant's alleged failure to renew Moret's contract constitutes a materially adverse employment action, Plaintiff still fails to establish a *prima facie* case for retaliation because Plaintiff fails to satisfy the third element.

The third prong of the *prima facie* case requires that Plaintiff proffer evidence of a causal connection between the protected activity and the adverse employment action. Here, Plaintiff first reported her complaints against Dr. Chung on or about January 9, 2001, when she submitted her initial statement to Col. Milhous, and on September 30, 2001 when her contract expired and was not renewed. (Moret Dep. 122-126; Milhous Dep. 77). The Court believes that the eight month period

23

between Moret's first report of her complaint against Dr. Chung and the expiration/non-renewal of her contract in September 2001 is insufficient to create a causal link between the two events. <u>See Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 278 (4th Cir. 2001) (finding that a six-month lag time between the protected activity and the alleged retaliation is sufficient to negate any inference of causation). Therefore, as Plaintiff fails to establish a *prima facie* case of retaliation, the Court will GRANT Defendant's motion for summary judgment as to Plaintiff's retaliation claim.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment shall be treated as a Motion for Summary Judgment under Rule 56(c). Defendant's Rule 12(f) motion is DENIED and Defendant's Rule 56(c) motion is GRANTED. An Order consistent with this Opinion will follow.

June 29, 2007                                          /s/
Date                                    Alexander Williams, Jr.
                                        United States District Judge